J-S53027-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARK BIGGS | : | |
| | : | |
| Appellant | : | No. 2750 EDA 2019 |

Appeal from the PCRA Order Entered September 10, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0015926-2013

BEFORE: SHOGAN, J., LAZARUS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY LAZARUS, J.: **FILED: JANUARY 4, 2021**

Mark Biggs appeals from the order, entered in the Court of Common Pleas of Philadelphia County, denying his petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. After careful review, we affirm.

In January of 2015, Biggs was convicted by a jury of attempted murder,[1] criminal conspiracy,[2] and violations of the Uniform Firearms Act (VUFA).[3] The charges stemmed from a shooting that occurred on the evening of June 17,

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 901(a). **See** Information, 1/14/14, at 1 (indicating victim of attempted murder as Kimberly Jessie).

[2] 18 Pa.C.S.A. § 1102(c).

[3] 18 Pa.C.S.A. §§ 6105(a)(1) (persons not to possess firearms), 6106 (firearms not to be carried without a license) and 6108 (carrying firearms on public streets or public property in Philadelphia).

2013, in North Philadelphia. The trial court summarized the facts underlying the case as follows:

> On June 17, 2013, around one o'clock in the evening, Lakeisha Jessie was with her sons S[.]J[.] and J[.]Y[.] in North Philadelphia. S[.J.] asked his mother if he could spend the night at a friend's house. When Lakeisha said no, S[.J.] called her a "b*t^h." After this disagreement, Lakeisha's nephew [] walked by and Lakeisha asked him to "beat up" S[.J.] for disrespecting her. [Her nephew] continued the physical confrontation with S[.J.] until Lakeisha told him to stop.

> Later that evening, [Lakeisha's nephew] and S[.J.] encountered one another and began fighting again. Lakeisha then noticed that her son J[.]Y[.'s] father, Monroe Yates [(Yates),] was arguing with [Lakeisha's nephew] as well. At this time[,] Lakeisha called [her nephew's] mother, her sister, Kimberly Jessie, to pick up her son. When Lakeisha told [Yates] to leave [her nephew] alone, he walked away towards Franklin Street.

> Kimberly Jessie was with friends nearby on 10th Street when Lakeisha called her. As she walked down 9th Street near Pike Street to find her son [], Kimberly passed [Yates] and [Biggs]. She stopped to speak to [Yates] about the incident. While they were speaking, Kimberly's [three] sons[,] Robert, Raheim[,] and Tyreek[,] approached them. Raheim said, "Nobody is going to do anything. Nobody is going to touch my family." This made [Biggs] and [Yates] angry, and Kimberly walked them across the street. [Biggs] and [Yates] left together in a white vehicle.

> At approximately 10:30 that evening, Officers Dayton Bennett and Joseph Marion responded to a report of shots fired in the area of 9th and Pike Streets. The initial call reported five or six shots fired. Upon arrival, the officers found a group of around 20 people gathered in the area. They also saw Kimberly Jessie lying on the curb between Percy and Delhi Streets. She had been shot and was in distress, screaming, "They tried to shoot my son. They tried to shoot my son. The mother f-ers tried to shoot my son." Kimberly testified that she was shot in the right thigh, and that the bullet entered from the back and exited the front of her leg.

> Lakeisha Jessie was also at the scene and spoke to Officer Marion when he arrived. Lakeisha identified [Biggs] and [Yates] as the shooters to Officer Marion at this time. Once Kimberly was transported to the hospital, Lakeisha was brought to East

Detective's Division to make an official statement. Detectives Ronald Kahlan and Daley[4] interviewed Lakeisha at about 11:35 [p.m.] At this time, Lakeisha again identified [Biggs] and [Yates] as the individuals who had shot at her nephew [] and his mother[,] Kimberly. She stated that she saw both men holding black handguns.

After being treated for her injuries, Kimberly Jessie was also interviewed by Detectives Kahlan and Daley that night. Detective Daley described her as "hysterical. She was in a lot of pain. She was upset, angry, [feeling] a lot of emotion." Kimberly had brought the jeans she had been wearing to the detectives, who placed them on a property receipt. During this interview, Kimberly also identified [Biggs] and [Yates] as the shooters, and circled both of their pictures [on a photographic lineup]. She told detectives that she saw each man holding a handgun, one black and one silver. Although the interview was cut short due to the pain Kimberly was in, she was able to review and sign her statement that evening.

Detectives John Ellis and McCullough[5] processed the scene of the shooting to search for evidence. After an initial search of the area did not yield any results, they went to Temple University Hospital to speak to Kimberly Jessie, who was still being treated at that time. They learned that she had been shot closer to 9th Street, and returned to the scene to refocus their search. They discovered two fired cartridge casings east of 9th Street, in an area that had not been previously secured as part of the crime scene. The first casing was found under a Chevrolet Impala parked at the southeast corner of 9th and Pike Streets. The second casing was recovered from under a Toyota Corolla in the same area. The Toyota Corolla appeared to have a bullet hole in the hood. Both fired cartridge casings were of the same make and model. Firearms examiner Letitia Cannon examined the fired cartridge casings and concluded that they had been fired from the same firearm.

Another bullet went into the home of Della Jamison at 3900 North Delhi Street, at the corner of Pike Street. Ms. Jamison testified

---

[4] Detective Kahlan's first name is found nowhere in the certified record on appeal.

[5] Detective McCullough's first name is found nowhere in the certified record on appeal.

- 3 -

that she had heard what sounded like gunshots that evening, and thought something may have hit her home. Upon going upstairs later than night, she found damage to a hat and perfume bottle. Officer Malcom Scott investigated Ms. Jamison's house the next day when she reported the damage. In his report, Officer Scott noted that a "possible bullet went through the front bedroom wall, traveled through the middle bedroom, and is lodged in the bedroom wall."

On August 10, 2013, Sergeant Wali Shabazz was making an unrelated car stop at 10th and Butler Streets in the same neighborhood as the shooting and was approached by Kimberly Jessie. After finishing the car stop, Sergeant Shabazz walked over to Kimberly to speak with her. She told him that he should "be looking for the people that shot me," and that she was "scared for [her]self and [her] kids." Sergeant Shabazz asked her for the names of the men who shot her, and she responded with [Biggs'] and [Yates'] names.

Sergeant Shabazz found a warrant for [] Yates [], and went to the address listed at the 3900 block of Franklin Street. When [Yates] came to the door, Sergeant Shabazz, who was in full uniform, told him he was there to respond to a burglar[] alarm. When [Yates] replied that he did not have an alarm, Sergeant Shabazz excused himself and called for backup. When Sergeant Shabazz returned to the door, [Yates'] wife answered. [Yates] then tried to slam the door on Sergeant Shabazz and ran towards the back of the house. Sergeant Shabazz pursued him to the back door and was able to place [Yates] under arrest.

Sergeant Shabazz remained in touch with Kimberly Jessie regarding [Biggs], whose whereabouts were still unknown at the time. [Biggs] was not present in the City of Philadelphia, and was eventually apprehended by United States Marshalls [sic] on November 8, 2014.

Trial Court Opinion, 6/27/16, at 2-6 (citations to record omitted). Biggs and Yates were indicted by a grand jury and proceeded to a joint jury trial. At trial, both Kimberly and Lakeisha repudiated their prior statements to police identifying Biggs and Yates as the shooters.

On January 28, 2015, a jury convicted Biggs of the above-mentioned offenses. On July 22, 2015, Biggs was sentenced to 10-20 years in prison for attempted murder, a consecutive sentence of 5-10 years' imprisonment for persons not to possess firearms, and concurrent sentences of 10-20 years for conspiracy to commit murder, 3-6 years' imprisonment for firearms not to be carried without a license, and 1-2 years in prison for carrying a firearm on public streets or public property in Philadelphia—an aggregate term of 15-30 years' imprisonment. Biggs filed a motion for reconsideration and a post-sentence motion for extraordinary relief. The motions were denied by operation of law on November 23, 2015. Counsel filed a timely direct appeal challenging the sufficiency of the evidence supporting Biggs' convictions, the court's jury charge on identification, and the discretionary aspects of Biggs' sentence. Counsel moved to withdraw from representing Biggs; the court granted counsel's motion and appointed counsel for direct appeal. On appeal, our Court affirmed Biggs' judgment of sentence. *See Commonwealth v. Biggs*, No. 3558 EDA 2015 (Pa. Super. filed May 12, 2017) (unpublished memorandum decision). Biggs filed a petition for allowance of appeal, which the Pennsylvania Supreme Court denied on October 12, 2017.

On February 15, 2018, Biggs filed a timely *pro se* PCRA petition raising more than 100 issues. On April 17, 2018, the court appointed PCRA counsel, who filed amended and supplemental amended petitions on his behalf. On July 24, 2019, the court issued Pa.R.Crim.P. 907 notice of its intent to dismiss Biggs' petition without further proceedings, deeming all issues "without

merit." **See** Pa.R.Crim.P. 907 Notice, 7/24/28, at 1. Biggs did not file a response. On September 10, 2018, the court dismissed Biggs' petition. Biggs filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He raises the following issues for our consideration:

(1) Did the trial court err in denying [Biggs] an evidentiary hearing when [he] asserted that appellate [] counsel was ineffective for failing to raise an issue raised by [trial] counsel concerning a charge relating to the credibility of a [C]ommonwealth witness?

(2) Did the trial court err in denying [Biggs] an evidentiary hearing when [Biggs] asserted that trial [] counsel was ineffective in failing to move for judgment of acquittal on the violation of the three [(VUFA)] offenses when [the C]ommonwealth failed to prove that the barrel length of the firearm was less than 15 inches?

(3) Was the sentence imposed on the criminal conspiracy offense illegal because the offense merges with [the] attempted murder offense for the purpose of sentenc[ing]?

Appellant's Brief, at 2.

Our standard of review for an order denying PCRA relief is whether the record supports the PCRA court's determination, and whether the PCRA court's determination is free of legal error. **Commonwealth v. Allen**, 732 A.2d 582, 586 (Pa. 1999). Moreover, a defendant is entitled to an evidentiary hearing in PCRA proceedings when he or she raises material issues of fact. Pa.R.Crim.P. 908(A)(2).

With respect to claims of ineffective assistance of counsel, we begin with the presumption that counsel is effective. **Commonwealth v. Spotz**, 47 A.3d 63, 76 (Pa. 2012). To prevail on an ineffectiveness claim, a petitioner must

- 6 -

plead and prove, by a preponderance of the evidence, three elements: (1) the underlying legal claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice because of counsel's action or inaction. *Id.* (citation omitted).

In his first issue, Biggs contends that appellate counsel was ineffective for failing to raise on direct appeal whether the trial court erred in denying trial counsel's request for a flight instruction with regard to Commonwealth witness, Kimberly Jessie.

Our standard of review in addressing challenges to jury instructions is an abuse of discretion. *Commonwealth v. Leber*, 802 A.2d 648, 651 (Pa. Super. 2002). Instantly, defense counsel requested the court issue a flight instruction with regard to witness Kimberly Jessie "and her absenting herself from the grand jury." N.T. Jury Trial, 1/26/15, at 35. Specifically, counsel stated, "I know that historically[,] traditionally going back to — flight is — [a] flight charge is given against the defendant, but I think that in this particular case, we have evidence that the Commonwealth's primary complaining witness fled the grand jury [proceeding]." *Id.* In response to the request, the trial judge noted that the issue of a witness's flight was one of credibility that the jury, as factfinder, could assess, and, therefore, did not issue the instruction. *Id.* at 36.

Trial counsel was correct in his assertion that a flight instruction is traditionally available to the prosecution where "the defendant has fled or concealed himself immediately after the crime occurred or at some time later."

*Commonwealth v. Milligan*, 693 A.2d 1313, 1317 (Pa. Super. 1997), citing Note to Pa.S.S.J.I. (Crim) 3.14. However, in *Milligan*, our Court considered for the first time whether such an instruction is available to a defendant who is attempting to establish that *another person*, rather than him/herself, is the true guilty party. *Id.* Concluding that an instruction is available to a party other than the defendant, our Court stated, "it would appear that, once a defendant properly introduces evidence that someone fled the crime scene, the trial court is duty bound to instruct the jury concerning the significance of this evidence." *Id.*

Here, Biggs attempts to argue that a flight instruction is appropriate when a Commonwealth witness absents him/herself from grand jury proceedings. The facts underlying the instant case are drastically different than those in *Milligan* where the defendant used a flight instruction as a defense where there was an "abundance of evidence" that a third party fled from a crime scene, thus implying that party's guilt. *Id.* at 1318. Here, Biggs did not attempt to introduce evidence that Kimberly Jessie fled the crime scene or that she was the guilty party who committed attempted murder. Rather, Kimberly was an eyewitness to and an ultimate victim of the shooting incident; she fully cooperated with the police and was never a suspect. Therefore, we agree with the trial judge that the issue regarding Kimberly's flight from grand jury proceedings was a matter of credibility best left to the jury; it was not appropriate for a flight instruction. *Milligan*, *supra*. Accordingly, we cannot

find that appellate counsel was ineffective for failing to raise this meritless issue on appeal.[6]

In his next issue on appeal, Biggs contends that trial counsel was ineffective for failing to move for judgment of acquittal on his VUFA offenses when the Commonwealth did not prove that the barrel length of the firearm used by Biggs was less than 15 inches. Specifically, he asserts that the Commonwealth did not establish the length of the barrel at trial where "the alleged weapon was never found and introduced into eviden[ce] and the only description of it was a small black handgun kept in the pocket of a hoodie."[7] Appellant's Brief, at 11.

In order to convict Biggs of the charged VUFA offenses, the Commonwealth had to prove that Biggs possessed, used or carried a firearm. **See** 18 Pa.C.S.A. §§ 6105(a)(1); 6106; and 6108. Pursuant to 18 Pa.C.S.A. § 6102, a "firearm" is defined as:

---

[6] In his closing argument, defense counsel highlighted the fact that Kimberly Jessie "ran out of" the second grand jury proceedings, despite being subpoenaed to attend. **See** N.T. Jury Trial, Closing Arguments, 1/26/15, at 33-35.

[7] The trial court, the Commonwealth and even Biggs incorrectly state that Lakeisha described Biggs' gun as "a black gun . . . he stuck in his hoodie." In fact, that specific description was given by Lakeisha with regard to Yates' gun. **See** N.T. Jury Trial, 1/22/15 (Vol. I), at 36 (statement by Lakeisha Jessie indicating "[a] few minutes later I heard screaming coming from 3800 Percy Street and **I saw Monroe [Yates]** had a black gun and he stuck it in his hoodie pocket") (emphasis added).

**Any pistol or revolver with a barrel length less than 15 inches**, any shotgun with a barrel length less than 18 inches or any rifle with a barrel length less than 16 inches, or any pistol, revolver, rifle or shotgun with an overall length of less than 26 inches. The barrel length of a firearm shall be determined by measuring from the muzzle of the barrel to the face of the closed action, bolt or cylinder, whichever is applicable.

18 Pa.C.S.A. § 6102 (emphasis added).

During trial, evidence was offered to establish that the barrel length of Biggs' gun was less than 15 inches. Specifically, in her statement to police following the shooting, Lakeisha Jessie stated that she saw Biggs[8] "pull[] a black handgun from the front of his pants in his waist and cock[] the gun" and that the gun "was black . . . [and] looked like [a] police gun." N.T. Jury Trial, 1/22/15, at 37, 41. Additionally, Detective Daley confirmed that Lakeisha gave him a signed statement saying that she witnessed Biggs remove a black handgun and shoot at Raheim. N.T. Jury Trial, 1/22/15 (Vol. I), at 168-69. *See Commonwealth v. Rozplochi*, 561 A.2d 25, 31-32 (Pa. Super. 1989) (where one witness testified defendant's weapon was inside envelope that was "about this high" and "not too wide," and another witness testified defendant had "small black gun," evidence sufficient to show barrel length of gun fell within prescribed dimensions defined in section 6102). Eyewitness testimony that Biggs pulled his gun from the waist of his pants was sufficient for the jury

_____

[8] At trial, Kimberly and Lakeisha identified Biggs as an individual they knew by the name of "Saladine Sweets." N.T. Jury Trial, 1/21/15, at 26; N.T. Jury Trial, 1/22/15, at 9.

to infer that the gun possessed by Biggs had a barrel length of less than 15 inches. Thus, we find no merit to this ineffectiveness claim. *Spotz*, *supra*.

Finally, Biggs contends that his sentence is illegal where his sentence for criminal conspiracy[9] should have merged with his sentence for attempted murder under 18 Pa.C.S.A. § 906.[10] Again, we find no merit to this claim.[11]

"A claim that crimes should have merged for sentencing purposes raises a challenge to the legality of the sentence." *Commonwealth v. Nero*, 58 A.3d 802, 806 (Pa. Super. 2012). Thus, our standard of review is *de novo* and our scope is plenary. *Id.* Under section 906 of the Crimes Code:

**§ 906. Multiple convictions of inchoate crimes barred**

A person may not be convicted of more than one of the inchoate crimes of criminal attempt, criminal solicitation or criminal conspiracy for conduct designed to commit or culminate in the commission of the same crime.

---

[9] First, we point out that the Commonwealth amended its information to change its original charge of criminal conspiracy under 18 Pa.C.S.A. § 903 to conspiracy to commit murder under 18 Pa.C.S.A. § 1102(c). *See* Commonwealth's Memorandum for Sentencing, 7/21/15, at 5 n.1; *see also* Sentencing Form, 7/22/15, at 3 (noting original conspiracy charge under section 903 "inactive" and "changed" to conspiracy to commit murder under section 1102(c)). Thus, contrary to Biggs' argument in his appellate brief, he was not convicted and sentenced under section 903.

[10] Other than a blanket statement that his inchoate sentences should have merged, Biggs provides absolutely no legal analysis or argument to support his claim that he was subjected to an illegal sentence. *See* Pa.R.A.P. 2119.

[11] The trial court states in its Rule 1925(a) opinion that "the record plainly shows that [Biggs'] inchoate convictions did merge for the purpose of sentencing." Trial Court Opinion, 8/3/20, at 10. However, this misses the mark. Section 906 prohibits a court from *convicting* a defendant of more than one inchoate crime for conduct committed at the same time. Moreover, the court did sentence Biggs separately on each inchoate crime, albeit running the sentences concurrently.

18 Pa.C.S.A. § 906. *See Commonwealth v. Grekis*, 601 A.2d 1284, 1295 (Pa. Super. 1992) (section 906 "is designed to eliminate multiple . . . judgments of sentence for conduct which constitutes preparation for a single criminal objective."). "[I]nchoate crimes merge only when directed to the commission of the same crime, not merely because they arise out the same incident." *Commonwealth v. Graves*, 508 A.2d 1198, 1198 (Pa. 1986).

Here, Biggs was not convicted of more than one inchoate offense for the same crime; thus, his sentence is not illegal. Biggs' conviction for attempted murder was for a different victim (Kimberly Jessie) than his conviction for criminal conspiracy to commit murder (Raheim J[.]). *See* N.T. Jury Trial, 1/28/15, at 18-19 (stating that Biggs charged with attempted murder for "sho[oting] at Kimberly Jessie" with the "specific intent to kill [her]" and with the "fully formed intent to kill[.]"); *see also id.* at 19 (stating Biggs charged with conspir[ing] with intent to kill Raheim J[.] by "fir[ing] with the intent to kill Ra[heim] J[.] . . . at the time [he] in fact shot Kimberly Jessie.[]"). Because the two inchoate crimes were intended to culminate in the commission of two different crimes, Biggs' sentence "did not run afoul of [s]ection 906." *Commonwealth v. Jacobs*, 39 A.3d 977, 978 (Pa. 2012) (where record established each inchoate crime (attempted escape and conspiracy to commit escape) had separate criminal purpose, sentence did not violate section 906). Where there is no merit to this underlying claim, counsel cannot be deemed ineffective. *Spotz*, *supra*.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>1/4/21</u>